UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronald R. REWALD,
Defendant–Appellant.

No. 85–1353.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 23, 1988.

Decided Nov. 13, 1989.

A. Brent Carruth, Van Nuys, Cal., for defendant-appellant.

John F. Peyton, Jr., Asst. U.S. Atty., District of Hawaii, Honolulu, Hawaii, Theodore S. Greenberg, U.S. Dept. of Justice, Crim. Div., Washington, D.C., for plaintiff-appellee.

Before ALARCON, HALL, and KOZINSKI, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Defendant–Appellant Ronald R. Rewald was convicted on ninety-four counts of a criminal indictment charging mail fraud, interstate transportation of stolen securities or money, false statement to a federal officer, perjury, falsely representing accounts as being insured by the Federal Deposit Insurance Corporation (FDIC), securities fraud, failure to maintain books and records as required by the Securities and Exchange Commission (SEC), fraud by an investment advisor, income tax evasion, and subscribing to a false document. Rewald committed these crimes by swindling hundreds of investors in his investment firm out of millions of dollars. His principal defense at trial, and now on appeal, is

that the Central Intelligence Agency (CIA) told him to spend the investors' money extravagantly so as to cultivate relationships with foreign potentates and wealthy businessmen who would be useful intelligence sources. We reject all of Rewald's arguments save one, which requires a remand to the district court for further proceedings.

## I

In 1978, Rewald and a partner, Sunlin L.S. Wong, formed an investment firm named Bishop, Baldwin, Rewald, Dillingham and Wong (Bishop Baldwin), located in Honolulu, Hawaii. Rewald, a charming and captivating salesman, immediately began luring investors into Bishop Baldwin's "investment savings account" with a promised guaranteed return of twenty percent and an additional five to seven percent, depending on Bishop Baldwin's earnings. The investors ultimately numbered 400, and their investments—sometimes an individual's life savings—totaled $22 million. After a group of investors filed an involuntary bankruptcy petition, a court-appointed bankruptcy trustee took over Bishop Baldwin on August 4, 1983, finding it virtually without assets to repay the $17 million owing to investors.

Rewald's misrepresentations about Bishop Baldwin and its investment savings account were bold and imaginative. He claimed that Bishop Baldwin was one of the largest and most venerable investment firms in Hawaii, with roots dating back sixty-five years. He falsely described the firm's clientele as having included, among others, the last four presidential administrations and Elvis Presley, with individual investors having an average worth of $4 million. Rewald told of a two-year waiting list to become Bishop Baldwin clients and a reported ninety percent rejection rate of those who applied.

Rewald sometimes described the investment savings accounts as merely a break-even accommodation for the firm's wealthiest clients. Despite this laissez-faire front, Bishop Baldwin's investment consultants aggressively sought money from any and all sources, motivated by huge commissions of up to fifty percent. In addition to the enormous rate of return, Rewald promised investors that Bishop Baldwin pursued an "ultraconservative investment policy" and that the investment savings accounts were guaranteed by the FDIC, Lloyds of London, or some other insurer.

A key aspect of the fraud scheme was to discourage investors from withdrawing their funds. Rewald told investors that their "earnings" were tax free unless withdrawn. In addition, Bishop Baldwin maintained the facade of investor prosperity through periodic mailings of letters and reports to investors, purportedly documenting the firm's glowing financial performance.

Rewald conceded at trial that he had made these and numerous other false promises to investors and that he spent investor money on countless luxuries, including the purchase of a polo club. His sole defense was that the CIA had directed him to create Bishop Baldwin and to operate it for the CIA's benefit, and that the CIA had promised to reimburse Bishop Baldwin for all these expenses because they were incurred in initiating and maintaining intelligence contacts. In short, he argued that he lacked the criminal intent necessary for conviction.

Prior to trial, Rewald filed an affidavit outlining his alleged relationship with the CIA, claiming to be a covert CIA agent. He said that all his actions relevant to the indictment were carried out on the orders of the CIA. Specifically, Eugene Welch, Chief of the CIA Domestic Collection Division's (DCD) Honolulu Office, instructed him and Sunlin Wong to set up the Bishop Baldwin firm for the CIA's benefit. Rewald also stated that he was provided with fake degrees in business administration and law from Marquette University. His mission was to cultivate social and business contacts with wealthy and well-placed businessmen and government officials.

Rewald's affidavit also stated that the CIA expanded its use of Bishop Baldwin to include transferring funds through the firm's investment savings accounts to cov-

ert foreign intelligence operations. The CIA also used the accounts to shelter funds of highly placed foreign diplomats and businessmen who sought to "export" currency to the United States. Rewald's most dramatic accusation was that the CIA used Bishop Baldwin to facilitate arms sales to several foreign countries.

## II

While Rewald did not take the stand, extensive evidence of his relationship with the CIA was introduced at trial, primarily through the testimony in the government's case-in-chief of several former CIA officials. Welch of the Honolulu DCD office was the first to meet Rewald. The DCD's mission is to collect intelligence data on foreign persons and matters from private American citizens (known as "contacts") who voluntarily offer to assist the CIA. These contacts sometimes will telephone the DCD with unsolicited information that the contact feels would be of assistance to American intelligence officials. The DCD's telephone number is listed under "Central Intelligence Agency" in the telephone book, and officers such as Welch are known as overt agents, because they are publicly acknowledged to be CIA officials. A contact usually develops information from meeting a foreign citizen while traveling abroad.

After a long career in the CIA, Welch moved to Honolulu in September 1976 to become chief of the DCD's field office there. This office had one clerical employee and one professional employee—the chief. Welch had never been to Hawaii before moving there in 1976, and as he approached retirement he considered Hawaii a desirable assignment. Before moving to Hawaii Welch had not heard of Rewald. Indeed, he had not heard of Rewald until June 30, 1978, when he received a telephone call from him at the office.

Rewald told Welch that he recently had returned from visiting a Far Eastern country that he thought would be of intelligence interest. Rewald asked to meet Welch, expressing great sympathy for the CIA and the intelligence community at large. Believing Rewald to be a potentially help-

ful contact, Welch agreed to meet him for lunch. At their meeting on July 6, 1978, Rewald told Welch that he owned a chain of retail sporting goods stores and that he planned to travel extensively throughout the Far East, including China and Japan, to establish manufacturing sources for sporting goods. Rewald said his company was called Consolidated Mutual Investment Corporation (C.M.I.), and that it originated in Wisconsin, although it had failed there. Rewald also said that he had been a professional football player with the Cleveland Browns, that he had B.A. and M.A. degrees from Marquette University, and a Ph.D. from the Massachusetts Institute of Technology. Rewald said he had assisted the CIA in monitoring radical student groups while in college.

After lunch, Welch returned to the office and filled out a standard "name check" request form. This form is sent to CIA headquarters in Langley, Virginia, and it requests a search of the person's name in the files of certain federal agencies, including the F.B.I., for derogatory information. Basically, the name check entails only a preliminary search for information readily available in established channels. Once a name check is approved from headquarters, a field officer is permitted to alert a contact to the CIA's "requirements," or issues of particular interest to the CIA, relating to a particular foreign country or region. The contact can be made privy to classified information, up to the level of "secret."

Welch included on the name check form the biographical data Rewald had supplied at lunch. Welch also made an entry on Rewald's "source contact card," documenting their meeting and discussion for Welch's files. Welch created this contact card for Rewald on June 30, after Rewald called for the first time.

Welch telephoned Rewald near the end of July to see if he had made the travel plans he mentioned at lunch. Welch also told Rewald that he would be retiring and that his successor would be Jack Kindschi. Soon afterwards, Kindschi traveled to Honolulu to familiarize himself with the area and the office. Welch was still chief of the

Honolulu office. It was Welch's responsibility to introduce Kindschi to established contacts in Honolulu. While Rewald was not an established contact, Welch thought that his planned foreign travels would make him a useful source in the future. Welch also was impressed by Rewald's patriotism and his great enthusiasm for the role of the intelligence community.

In July, Rewald had invited Welch and Kindschi to his house for dinner during Kindschi's upcoming visit in early August. The purpose of this dinner was to introduce Rewald and Kindschi. Kindschi testified that the dinner was simply social and that no CIA business was discussed. After dinner, Welch made another entry on Rewald's source contact card, where he reiterated that Rewald could be a useful source of foreign intelligence information. Welch never saw Rewald again after that dinner, and he left Honolulu on September 15, 1978. Kindschi took his place as chief of the Honolulu office.

Before Welch's departure, he had prepared a document summarizing Rewald's background and potential usefulness as a contact, which was to be forwarded to headquarters in Washington. This was standard practice in the DCD. Kindschi signed this document on September 14, and forwarded it to headquarters. Kindschi received approval from headquarters on September 22 to use Rewald as a contact; his name check had been approved.[1]

Shortly after Kindschi and his wife arrived in Hawaii, Rewald invited them over for dinner with his wife and family. This initiated a strong friendship between the families, which saw each other socially two or three times a month. The Rewalds were the Kindschis' closest friends in Hawaii.

Professionally, Rewald repeatedly volunteered his services to Kindschi, professing to be eager to help the CIA in any way possible. The two met frequently; Kindschi's records reflect ten meetings in the last three months of 1978, twenty-four meetings in 1979, and thirteen meetings in 1980. At many of these meetings they would discuss Rewald's travel plans and the CIA's requirements for particular countries. At other meetings, Rewald would report back on the substance of his conversations with foreign businessmen.

In October 1978, an opportunity arose to accept Rewald's offer to provide further assistance. Kindschi received a cable from headquarters seeking his assistance in obtaining a commercial cable address and telephone number in Hawaii for two covert agents operating in the Far East. Basically, the CIA needed a private company willing to provide light cover, known as backstopping in the intelligence community, for these foreign agents. Backstopping would require maintaining a telephone and telex, and confirming to any inquirers that the agent was associated with the commercial enterprise.

Kindschi identified three possible persons for the job, but he recommended Rewald, who repeatedly had volunteered to assist the Honolulu office and whose company, C.M.I., had diversified business interests in the Far East. On November 6, headquarters agreed to use Rewald and asked him to create a backstop. The backstop initially was named H & H Enterprises, and later was renamed Canadian Far East Trading Corporation (Far East Trading) after it was learned that a legitimate company was named H & H Enterprises. It existed only on paper.

Rewald arranged for a telex and telephone for the fictional company. If Rewald received an inquiry, he was to say that the company was a general trading firm incorporated in Hawaii, and that the two agents were sales managers who had conducted their business in Vietnam and Cambodia prior to 1975. The CIA reimbursed Rewald for the telephone and telex expenses, but otherwise did not pay Rewald for his assistance.

On May 18, 1979, Kindschi sent a cable to CIA headquarters stating that Rewald had volunteered to provide any additional

---

1. Welch testified that Rewald's security approval had not been received at the time he retired. The document from headquarters supports this account. Kindschi testified, however, that Rewald already had been approved when he took over as chief.

support services the CIA might need. Rewald told Kindschi that his business was moving into a new building and that additional resources would be available. Kindschi included a description of Rewald's business, identified as C.M.I., which stated that it was involved in financial planning, investments, real estate, and so forth, and that Elvis Presley was a former client.

Rewald's offer again came at an opportune time for the CIA, as it was seeking a commercial cover for a covert agent in the Foreign Resources Division (FRD) named Richard Richardson. Richardson used the alias Richard Cavanaugh, and was the chief of the FRD's Southern California division. The FRD contacts foreign nationals living in the United States and seeks their assistance with intelligence gathering.

John Mason assisted Richardson in securing commercial cover. Mason had been a covert CIA employee for twenty-five years.[2] In 1979, he was assigned to the Corporate Cover Branch, which is responsible for obtaining cover for covert agents. Richardson contacted Mason sometime in May or June, requesting more information on Rewald and C.M.I. Richardson evidently had seen Kindschi's cable offering Rewald's and C.M.I.'s services. On June 8, 1979, Mason requested immediate approval to contact Rewald about providing cover for Richardson.[3] Mason was granted provisional approval for "contact and assessment only." Mason learned from the CIA's security office that Rewald had been involved in the sale of unregistered stock or franchises in Wisconsin. Mason contacted Rewald and arranged to meet him in Los Angeles, California, on June 25, 1979.

As planned, the two men met for one hour in Los Angeles. Mason outlined Richardson's cover needs, which were described in an internal CIA memorandum as a "well-backstopped cover identity." The memorandum states in part:

> The cover should permit Mr. Richardson to portray himself [in alias] as a personal assistant or representative of the senior officer or owner of a substantial [or substantial appearing] company or other public organization. The senior or owner should be prepared, in case of an inquiry, either personally to substantiate that the individual exists and holds the claimed position, or have the person in his office to which queries would be likely directed do so. The head of the company should be the kind of individual who plausibly could have been a major political contributor before a strict limitation on donations to political candidates was imposed.

Mason informed Rewald that the CIA would have to conduct a comprehensive background check before it could use him to backstop Richardson. Mason also showed Rewald a copy of a standard letter agreement, whereby a business person such as Rewald agrees to provide cover for a covert field agent, and the CIA agrees to reimburse the person for actual expenses associated with the cover. Rewald subsequently signed an agreement effective July 15, 1979, acting on behalf of C.M.I.[4] The two men only discussed using C.M.I. as Richardson's commercial cover, but Rewald mentioned that he recently had formed another firm, Bishop Baldwin. Finally, Mason had Rewald sign a secrecy agreement because he had been made aware of the CIA's plans to provide cover support for a field operative. This particular secrecy agreement is different from the type of

---

**2.** Rewald argues that the John Mason who testified at trial was an imposter. However, Rewald presented no evidence to substantiate this remarkable assertion.

**3.** The document Mason prepared requesting clearance to meet with Rewald had two different date stamps on it, June 8, 1979, and June 8, 1978. Mason testified that the document was prepared in 1979. The other relevant documents, including Kindschi's May 18, 1979, memorandum advising headquarters of Rewald's availability for additional cover services,

and the security office's June 18, 1979, response to Mason's request, support Mason's testimony. Rewald argued at trial that the document was prepared in 1978 and proved that the CIA had asked him to create Bishop Baldwin in that year.

**4.** Mason testified that the agreement was prepared on July 12, 1979, but that this was too late for Richardson to take it to Rewald for his signature at their first meeting in Hawaii several days later. Rewald did not sign the agreement until sometime in 1980.

agreement used by the CIA for its employee staff officers.

Rewald telephoned Mason a few days after their meeting and indicated that he was willing to have Richardson work in a cover position as C.M.I.'s fictional West Coast representative. Mason had suggested this position to Rewald. Rewald also expressed great consternation about the full background check Mason had mentioned. Rewald said that his participation was contingent upon the usual background check being waived. On July 3, Mason wrote to the security office and recommended that the background check be waived because "[n]o agency money will be advanced to Mr. Rewald, and the operational target and details will not be revealed to him." Significantly, Richardson needed the cover immediately. Subsequently, the CIA authorized the expenditure of $2,000 a year to reimburse Rewald for providing Richardson with cover services.

Although Mason did not hear back from the security office until October 25 regarding Rewald's clearance to provide cover to Richardson, the FRD had arranged for Richardson to meet Rewald in July. On July 9, Kindschi received a cable informing him of Richardson's impending visit to Hawaii and instructing him to introduce Rewald and Richardson. Kindschi testified that he only acted as an intermediary in this transaction, a broker, and that he met Richardson for the first time when he came to Hawaii in July. After that, Kindschi had no involvement in Richardson's relationship with Rewald or Richardson's covert assignment.

In August 1979, Richardson sent a memorandum to the Foreign Resources office handling his assignment, which provided the following description of Richardson's cover:

[c]an be described as a principal in a major Hawaiian and West Coast investment firm [C.M.I., subsidiary of BBRD & W] which has major interests in Asia as well as the U.S. The partners in this firm are from some of the oldest, wealthiest, and most influential families in Hawaii. As a result the company and these families are greatly concerned with matters relating to the political and financial affairs of the State of Hawaii, Asia and other locations where they have interests, as well as having extensive influence on the U.S. mainland. To protect their interests and the interests of the State of Hawaii these families have always maintained close political connections with any current administration, through major campaign contributions, appropriate discrete lobbying, and by providing advice, consultation and maintaining friendship with key political party and other central figures in the government.

Rewald did not call Richardson as a witness at trial. The district court ruled to be admissible, however, documentary evidence relating to Richardson's relationship with Rewald. Richardson recommended Bishop Baldwin as an investment to certain acquaintances and even opened a personal account for himself. In addition, certain Bishop Baldwin pamphlets identify Richardson, using his alias Cavanaugh, as an employee of Bishop Baldwin. As indicated in Richardson's August memorandum to the FRD, Richardson evidently concluded that "C.M.I., subsidiary of Bishop Baldwin" presented a better commercial cover than did C.M.I. alone. Beyond that, Rewald's failure to call Richardson as a trial witness leaves his actual relationship with Bishop Baldwin a matter of speculation.

On July 26, 1979, Kindschi received a request that Far East Trading serve as a backstop for an additional foreign agent, and Rewald agreed. The expectation was that the backstop would be used infrequently, if at all. Far East Trading only received one inquiry during its entire existence, and that was a misdirected telex about a fashion show.

Kindschi received a cable message from Washington on September 8, 1979, asking for his candid assessment of Rewald, in light of Rewald's then-pending application for clearance to serve as a commercial cover for Richardson. In response, Kindschi wrote a long, glowing recommendation of Rewald, which noted that Rewald "sets

high standards of moral conduct in everyday life," "is a man with no apparent vices," and had "no apparent evidence of deception in his character." Kindschi's letter also noted that the only area of skepticism was that Rewald originally contacted the CIA as a "walk-in." "In other words, he came into the office without being invited."

Not long after coming to know Rewald, Kindschi and he developed a financial relationship in addition to their professional and personal ties. In early 1979, Rewald spoke to Kindschi about investing in his sporting goods store. Rewald said he had been successful in running a sporting goods chain in Wisconsin, and he showed Kindschi his new store in Kaneohe, Hawaii. Rewald said he planned to open up to six athletic stores on the island. Kindschi immediately invested $5,000 and agreed to buy a ten percent stake in the company for an additional $42,000. Rewald wrote to Kindschi on C.M.I. letterhead on January 31, 1979, and stated that the name of the chain in Hawaii would be "Hawaii Sports Centers," and that its sales for 1978 were $936,318. Rewald also disclosed ambitious plans to manufacture athletic clothing in Taiwan. In March, Kindschi borrowed $42,000 from the Federal Credit Union and transferred it to Rewald. Rewald never told him that his Wisconsin sporting goods chain had gone bankrupt.

Throughout that year and into the next, Rewald sent Kindschi periodic reports and newsletters describing the sporting goods chain's dramatic financial success. In 1980, Kindschi and Rewald began to speak about Kindschi's upcoming retirement. Kindschi originally had planned to go back to the mainland, but Rewald was anxious to have him stay in Hawaii, mentioning that a position might be available at Bishop Baldwin after his retirement.

Kindschi retired on July 17, 1980. He left Hawaii for five months, returning in December. Kindschi testified that Rewald had suggested that after his retirement he should begin to take a draw on his previous investment in the sporting goods chain, and that he began to receive $1,000 a month in March 1981. Kindschi was unclear, however, whether this money was deducted from his aggregate investment, or whether it was a return on his investment. He testified to both, but he filed a claim in Bishop Baldwin's bankruptcy proceeding for the entire amount of his initial investment.

During cross-examination, it became clear that Kindschi actually began to receive $1,000 a month from Rewald in October, 1980. These checks were drawn on a Bishop Baldwin account. In addition, Kindschi received several lump sum payments totaling over $8,000, which he had failed to recollect in his direct testimony. His first payment of $3,000 came on June 30, 1980, while he still was chief of the DCD. He thought that this was reimbursement for the expense of leasing an automobile, which Rewald had insisted on providing for Kindschi after his retirement. He leased a 1980 Buick. Kindschi was uncertain what the other payments were for.

In March 1981, Rewald fulfilled his promise to bring Kindschi on board at Bishop Baldwin. Rewald asked Kindschi to work as a contract consultant on special projects. Kindschi was paid $60 per hour for his work. His first two projects involved research assignments for a couple of Rewald's wealthy foreign associates. Kindschi's work involved some travel, sometimes with Rewald. Kindschi also began to write special and quarterly reports, which were sent to Bishop Baldwin investors and addressed a variety of topics, usually focusing on particular geographic regions. Rewald also asked Kindschi to edit Bishop Baldwin's publicity pamphlet, called *Directions*, and an article that featured Bishop Baldwin in the local Chamber of Commerce publication. Rewald supplied the predicate factual information.

Kindschi also recommended that Rewald hire a person referred to as "John Doe 14" at trial. Rewald hired John Doe 14 as a consultant, who eventually took charge of an overseas office of Bishop Baldwin. At the time he was hired, and for three months thereafter, John Doe 14 was a con-

tract agent for the CIA. He made investment suggestions and identified individuals who might invest or offer investment opportunities. The jury was told that "Bishop–Baldwin did not implement any of the investment suggestions, and no investment was made as a result of John Doe 14's contact with people."

During the time Kindschi worked as a contract consultant to Bishop Baldwin, he also became an investor. In June 1981, Rewald told Kindschi that he had opened an account in Kindschi's name at Bishop Baldwin for $1,000. Rewald said that Bishop Baldwin was going to stop opening new investor savings accounts, and that it was a great opportunity to invest in before they were unavailable. Rewald said that he had advanced the money out of personal funds. Kindschi agreed and repaid Rewald soon afterwards. Subsequently, Kindschi became a major investor, investing $124,000 for his parents, and an additional $139,000 of his own funds. He borrowed $100,000 to make this investment. He lost it all after Bishop Baldwin went bankrupt.

On September 22, 1982, Kindschi accepted an unexpected invitation to join Bishop Baldwin's executive committee, which included a $2,000 a month consultant fee. He also continued to receive $60 an hour for work on particular projects. He attended a total of four meetings of the executive committee. He was an observer, learning about the firm's investment projects. In January or February 1983, he received a raise to $4,000 a month.

Kindschi's successor as chief was Jack Rardin. Rardin arrived in Hawaii by July 6, 1980, and Kindschi introduced him to Rewald soon afterwards because Rardin was to meet Kindschi's "primary contacts." Kindschi testified that, on July 10, 1980, the Far East agents informed him that the backstopping services were no longer needed, and that he informed Rewald that the telex and telephone should be disconnected. Rardin testified that the Far East cover was an "ongoing operation" when he arrived and that he discussed its continuation with Rewald in July. Rardin recalled that the Far East cover had been stopped for a couple of months, but that he was asked to renew it. Rardin continued to process the monthly telephone and telex expenses incurred in this cover.

As did Kindschi, Rardin spoke with Rewald about Rewald's foreign travels. Rewald occasionally would come by Rardin's office and ask for a briefing on a particular country he planned to visit. Rardin testified: "I always stressed to him that you are going there primarily for your business and not for me, but if in your conversations and meetings with foreign businessmen and so on, if you would hear these kind of things, we'd be interested." While Rardin considered Rewald a friend and generally an excellent source of foreign intelligence, he did not develop the sort of extensive relationship with Rewald that Kindschi had. Rardin made a one-time $1,500 investment in Bishop Baldwin, which he later withdrew.

During his tenure, Rardin recalls requesting name checks from headquarters for several Bishop Baldwin employees, including Rewald's secretary, Sue Wilson, who handled the paperwork for the telephone and telex backstop. Rewald had introduced Rardin to three or four of his employees, and Rardin requested name checks after concluding that they might also be able to provide useful information developed through their private travels abroad. He spoke with a couple of these employees once or twice about the DCD's interest in other countries.

Rardin also recalls meeting Richardson on one occasion about a month after he became chief. He knew generally that Rewald was providing some sort of cover for Richardson, although Richardson did not report to him and Rardin was unfamiliar with the nature of Richardson's assignment. Rardin believed that a Bishop Baldwin pamphlet that listed Richardson's name as an employee (using his alias Cavanaugh) was part of Richardson's cover.

In November 1982, Rewald telephoned Rardin about an on-going IRS investigation into Rewald's financial affairs. He said that he was unsure how to explain the telex and telephone expenses for the Far

East cover operation to his accountant and requested direction. Rardin passed Rewald's request along to headquarters, which in turn asked Rardin to obtain further information from Rewald. Rardin spoke with Rewald and sent a cable to headquarters outlining their conversation.

Significantly, Rewald said that he received payments not only for the telephone and telex, "but also for passing funds to individuals in the Middle East, Argentina, Hong Kong, Taiwan, Indonesia, California, and Hawaii." In his cable, Rardin said that he had no knowledge of these alleged payments, but that he had no reason to doubt Rewald's veracity. Rardin said that Rewald was a "patriotic individual who tended to quickly follow instructions to the letter."

In response to Rardin's cable, two CIA officers traveled to Hawaii twice in January 1983 to speak with Rardin and Rewald. At the first January meeting, Rewald did not refer to passing funds to foreign sources and specifically said that the only money he had received was for the telephone, teletype, and miscellaneous expenses associated with the Far East backstop. Subsequently, CIA headquarters advised Rardin of three possible cover stories that Rewald could tell his accountant about Far East Trading and its predecessor, H & H Enterprises. Generally, Rewald was advised to describe these companies as existing only on paper.

At a subsequent meeting with Rewald in January, the officials told him that the IRS investigation would be held in abeyance temporarily as a result of an understanding in Washington between the CIA and the IRS. The officials told Rewald that more time was needed to investigate the facts of his relationship to the CIA. The CIA informed the IRS within several weeks that it had no objection to a resumption of the Rewald investigation.

Also at this meeting the official from Washington suggested that Rewald return any CIA documents that he had in his possession. As a result, Rardin spoke to Rewald and learned that he did have some intelligence-related documents in his office. Rardin retrieved a stack of documents provided to him by Rewald. Rardin told Rewald that the documents would be more secure in his office. Some of the papers pertained to the briefing requirements that Rardin had discussed with Rewald before his travels. Rardin commented that the documents could connect Rewald to the CIA "colder than a mackerel."

Rardin was instructed to sever ties with Rewald until the IRS' tax investigation was completed. Thereafter, the CIA terminated its relationship with Rewald. Rardin also was instructed to withdraw the $1,500 he had invested in Bishop Baldwin.

On July 29, 1983, television station KHON aired a story by reporter Barbara Tanabe that raised serious questions about Bishop Baldwin's legitimacy. The following day, Rewald attempted suicide using a razor blade to slash his forearm in the Sheraton Hotel in Waikiki. A grand jury returned a 100–count indictment against Rewald on August 30, 1984.

### III

The district court entered numerous pretrial orders in response to Rewald's repeated requests for classified information and CIA documents relating to Bishop Baldwin. Subsequently, the district court ruled that certain evidence would be inadmissible at trial. We review the district court's evidentiary rulings for an abuse of discretion. *See United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1983). Rewald bears the burden of establishing the relevance of classified information. *See United States v. Miller*, 874 F.2d 1255, 1276 (9th Cir.1989).

While Rewald devotes many pages in his brief to this issue, his argument can be summarized as follows: by precluding Rewald from introducing any evidence whatsoever of the specific intelligence activities that either he or CIA agents associated with Bishop Baldwin engaged in, the district court improperly excluded evidence having a tendency to prove that Rewald was a long-time agent of the CIA and was thoroughly enmeshed in many large-scale covert operations, thereby fatally under-

mining the credibility of Rewald's claim that the CIA created Bishop Baldwin and instructed Rewald to spend millions of dollars of investor money for the CIA's benefit.

### A

As Rewald's pretrial discovery requests involved classified information and documents, the district court followed the procedures outlined in the Classified Information Procedures Act (CIPA), 18 U.S.C.App. IV §§ 1–16 (1982). "Congress passed CIPA to prevent the problem of 'greymail,' where defendants pressed for the release of classified information to force the government to drop the prosecution." *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir.1988); Senate Rep. 96–823, 96th Cong., 2d Sess. 1–4 (1980), reprinted in 1980 U.S.Code & Cong.News 4294–98. CIPA establishes a comprehensive procedural framework for the discovery and admission of classified documents in a criminal prosecution.

CIPA section four governs the discovery of classified documents. Where a defendant is permitted to discover information under the Federal Rules of Criminal Procedure, CIPA permits the district court to authorize the government to redact information from classified documents, to substitute a summary of the information in the documents, or to substitute a statement admitting relevant facts. The United States, however, must make a written request for such limits on otherwise discoverable evidence, which the court reviews ex parte. Rewald sought discovery of documents pursuant to Fed.R.Crim.P. 16(a)(1)(C).[5]

CIPA section five requires that a defendant notify the government and the court in writing if he reasonably anticipates the disclosure of classified information in pretrial or trial proceedings. *See Miller*, 874 F.2d at 1276. Under CIPA section six, following such notice, the government may request a mandatory hearing to determine "the use, relevance, or admissibility of classified information." If the district court authorizes the disclosure of classified information, the government may request to substitute a statement admitting relevant facts or a summary of the classified documents "in lieu of the disclosure of such specific classified information." CIPA § 6(c). Where this statement or summary provides the defendant with "substantially the same ability to make his defense," the district court "shall" accept the substitution. *Id.* However, if the district court determines that the substitution is inadequate, and the government files an affidavit objecting to the disclosure of the information, the court is empowered to dismiss the indictment or to take other appropriate action to minimize the prejudice to the defendant. *Id.* at § 6(e)(2).

The district court below held several section six CIPA hearings. The court stated that "[t]he fact that the proposed evidence before the court contains classified information has no bearing on this court's determinations." Rewald urges this court to endorse the district court's ruling that CIPA only permits a district court to judge the admissibility of classified evidence under traditional standards of relevancy.

The government did not argue below, nor does it argue on appeal, that national security interests can trump a defendant's right of access to relevant information absent CIPA section 6(e)(2) sanctions. Nor did the district court purport to exclude the evidence on this basis. *But see United States v. Smith*, 780 F.2d 1102 (4th Cir. 1985) (en banc).[6] Under these circumstances, we decline Rewald's invitation to under-

---

5. Rule 16(a)(1)(C) provides in part: "Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense...."

6. *Smith* recognized a qualified privilege protecting against the disclosure of sensitive sources and methods of intelligence gathering. Where this privilege is applicable, otherwise relevant information is inadmissible and CIPA section six sanctions are inappropriate.

take an all-encompassing analysis of this issue, and simply confine our review to the relevancy and admissibility of the classified materials under Federal Rules of Evidence 401 and 403.

B

Rewald propounded 1,717 interrogatories on January 18, 1985, and sought the production of hundreds of classified CIA documents. The district court ordered the government to respond to each interrogatory by March 29, 1985, and to produce documents relevant to any of six possible defenses: (a) truth, as a defense to the perjury counts; (b) no scheme to defraud; (c) lack of specific intent; (d) reasonable reliance on apparent authority; (e) outrageous government conduct; and (f) entrapment.

The district court also ruled that pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Fed. R.Crim.P. 16, Rewald was entitled to discover eleven categories of information. As stated by the district court:

1. Whether the CIA told Rewald to set up a firm specializing in Far East investments, or directed that the firm should contain names synonymous with Hawaii.

2. Whether the CIA instructed Rewald to claim that [Bishop Baldwin] had been established since territorial days, was capitalized at $300,000, and had gross sales in excess of $1 million.

3. Whether CIA officials told Rewald that the CIA would provide him with false degrees from Marquette University.

4. Whether CIA officials directed Rewald to make representations regarding FDIC insurance.

5. Whether the CIA directed Rewald to maintain an extravagant lifestyle to contact and maintain relations with wealthy individuals from other countries for intelligence purposes.

6. Whether any money was paid to defendant by CIA officials as a result of his CIA-related activities or whether any

such promises were made to defendant by CIA officials.

7. Whether CIA officials made representations to Rewald that the CIA would cover any of [Bishop Baldwin's] losses.

8. Whether any of the [Bishop Baldwin] investors [invested] at the direction of the CIA.

9. Whether any of the [Bishop Baldwin] employees were CIA agents who acted in a role and capacity in that company of managing and handling any of the functions of that company, and were involved in the distribution and disbursement of any portions of any of the monies of that company.

10. Whether Rewald was told to make specific investments at the direction of CIA officials.

11. Any exculpatory information discoverable under *Brady.*

Prior to the district court's March 15th order, the government had released 220 CIA-related documents to the defense. In response to the court's order, the government released an additional 189 documents and provided twenty-nine "substitutions" pursuant to CIPA section four. Finally, the government responded to each of Rewald's 1,717 interrogatories.

Rewald objected to certain of the government's interrogatory responses, its production of some documents with redactions, and its failure to produce other documents. Pursuant to CIPA section six, the district court held a closed-to-the-public hearing on Rewald's motion to compel discovery and denied it.

Rewald filed a motion for reconsideration, which the district court denied on June 10, 1985. The court reaffirmed that Rewald "is entitled to discover information related to whether CIA officials directed him to engage in any of the activities charged in the indictment ..., for example, whether the CIA directed him to create [Bishop Baldwin], or whether the CIA promised to cover any of his investment losses." The district court's theory of discoverability is critical to the propriety of its rulings, and thus we reproduce it in full:

Information which shows that employees of the CIA solicited investors for [Bishop Baldwin] or directed the investments of the company may be material to Rewald's defense. The very fact that an employee of the CIA was a consultant or director of the company may likewise be material.

If, however, while serving as a consultant for [Bishop Baldwin] a CIA employee engaged in covert activities for the CIA and those activities in no way involved the disposition of the investors' funds, the defendant is not entitled to discover the nature of those covert activities. Those activities simply have no relevance to charges of mail and securities fraud. Disclosing such information to the trier of fact would not make "more probable or less probable" the proposition that the CIA directed the disposition of $20,000,000 of privately invested funds. See Fed.R.Evid. 401.

The fact that an investor in [Bishop Baldwin] may have been an employee of the CIA may be relevant to Rewald's defense. That fact alone, however, does not entitle the defendant to discover the extent of the investor's affiliation with the CIA or to discover information detailing the nature of the covert agent's activities for the CIA. That information would have absolutely no bearing on the criminal acts alleged in the indictment.

Similarly, the fact that the defendant may have supplied information to the CIA regarding foreign countries he visited is immaterial to the financial management of [Bishop Baldwin]. The court is not persuaded that such evidence is even circumstantially related to the creation and management of the defendant's company.

The district court's orders on the scope of discovery were followed by pretrial orders addressing the admissibility of certain evidence, including both evidence the government had produced and evidence Rewald sought to introduce through testimony and otherwise. Rewald filed CIPA section five notices on May 13, 1985, and June 5, 1985, of his intent to disclose classified information. The court held a hearing on this matter on June 5, 1985, issuing a written order on June 14, 1985.

The district court's admissibility rulings were based on its assessment of relevancy, balanced against Fed.R.Evid. 403's concerns for unfair prejudice, confusion of the issues, misleading the jury, waste of time, undue delay, or needless presentation of evidence.

C

The court adhered to its theory of the scope of discoverable evidence: specific instances of covert activities were inadmissible unless they indicated the CIA directed Rewald to spend Bishop Baldwin funds for CIA activities. Yet the district court gave Rewald some latitude in proving his defense. The court found a variety of evidence admissible for either the charges in the indictment or Rewald's possible defenses. The factual account presented in section II of this opinion provides some insight into the evidence of Rewald's relationship with the CIA that the court ultimately admitted at trial.

1

The court stated that it would permit evidence of Rewald's work for the CIA in the mid–1960s as an infiltrator of student organizations at the University of Wisconsin at Madison. The court also ruled admissible evidence of Rewald's initial contact in 1978 with Welch.

Significantly, the district court permitted evidence of Rewald's formation at the CIA's behest of the two fictitious companies, H & H Enterprises and Far East Trading. The court also found to be admissible all evidence relating to Rewald's expenses incurred in maintaining this backstop, including CIA reimbursements for telephone and telex expenses. The court also permitted Rewald to offer evidence that substantiated his claim that the CIA had asked him to form Bishop Baldwin as another notional company.

The court ruled that it would permit Rewald to offer evidence establishing that CIA official Richardson was linked to

C.M.I. and Bishop Baldwin. Rewald contended that the CIA asked him to relinquish C.M.I. to Richardson for use as a CIA cover company, and that this arrangement caused Rewald to transfer C.M.I.'s business affairs to Bishop Baldwin. The district court also ruled admissible a letter from Richardson to Rewald in which he requested that a Bishop Baldwin account be established for a certain individual, and another letter from Rewald to Richardson regarding this account. Moreover, the court ruled admissible various documents establishing that Richardson solicited investors for Bishop Baldwin.

Rewald sought to introduce documents describing Bishop Baldwin's offices in certain foreign locations, including London, Paris, Stockholm, Hong Kong, and Taiwan, and revealing the CIA's knowledge of these foreign offices. Rewald claimed that the CIA directed him to set up these offices to further covert intelligence activities. The court permitted introduction of the documents Rewald identified, finding that "the fact that the CIA was cognizant of the existence of [Bishop Baldwin] foreign offices is probative of defendant's claim that the CIA directed him to set up foreign offices of his company." The court also permitted evidence that Rewald hired an individual overseas who was connected to the CIA as a Bishop Baldwin consultant.

The court permitted Rewald to offer evidence of the CIA's alleged role in: drafting all the literature distributed by Bishop Baldwin, including financial reports and the firm brochure; directing Rewald to lead a "high profile lifestyle" to cultivate wealthy business persons and foreign politicians; ordering Rewald to increase Bishop Baldwin's investment activities so that the firm would appear to be more legitimate; placing CIA officials into positions at Bishop Baldwin with financial management responsibilities; and permitting Rewald to use the telex at his office for intelligence communications purposes. Rewald also sought to introduce additional evidence linking a former CIA official to Bishop Baldwin. The district court concluded that evidence establishing that a person associated with Bishop Baldwin was a former CIA official is relevant.

Bishop Baldwin had prepared a report entitled the "Hong Kong Capital Flight Study," which analyzed the financial consequences of the upcoming return of Hong Kong to China. Rewald contended that this report was prepared at the CIA's request using Bishop Baldwin funds. The court ruled that the report would be admitted into evidence for this purpose.

The court ruled that evidence of the CIA's intervention on Rewald's behalf in the IRS investigation was "relevant to establishing the significance of the CIA involvement with [Bishop Baldwin]." This evidence included three taped conversations between Rardin and Rewald.

Following Bishop Baldwin's collapse, former CIA official Kindschi wrote to CIA official Rardin regarding Kindschi's expectation that he would be subpoenaed. The court ruled this letter admissible to demonstrate the extent of CIA involvement with Bishop Baldwin.

2

The district court, however, refused to admit evidence of the details of specific intelligence activities. Consequently, Rewald was prevented from presenting evidence of the nature of his intelligence-related activities abroad, including the specific intelligence requirements provided to him by the CIA for various foreign countries. In addition, he was unable to offer details of the specific covert activities of CIA officials who had invested in Bishop Baldwin, as well as CIA officials for whom Rewald had provided backstopping services through Bishop Baldwin, C.M.I., or Far East Trading. Finally, he was precluded from describing the intelligence activities of Bishop Baldwin employees, who like Rewald, were informed of the CIA's requirements for particular foreign countries.

The jury did not hear a variety of evidence relating to Rewald's specific intelligence activities. While certain information remains classified, we can provide a rough sketch of various activities.

In his travels to Japan, Rewald obtained documents describing a high speed levitation train under development by Japan Air Lines. He provided these documents to the CIA Honolulu office. In 1980, Rewald met an Afghan refugee in Honolulu and spoke with Kindschi about obtaining political asylum for the refugee. Kindschi related this information to CIA headquarters. In 1982, Rewald met with persons planning a mission by Bo Gritz in search of American Prisoners of War in Laos. Gritz was the former Commander of the United States Special Forces in the Panama Canal Zone, and he sought Rewald's financial assistance. Rardin knew of Rewald's involvement.

Rewald also reported back to Rardin about his contacts with Enrique Zobel, a wealthy Filipino banker, and others, after Rewald had traveled to the Philippines in 1982. Rardin communicated the substance of Rewald's briefing to CIA headquarters. Rewald also met with a person claiming to be Prince Sauud Mohammad, Royal Crown Prince of Dubai, United Arab Emirate, whose father is the King of that country. Rewald formed a corporation with this person, and another corporation with Zobel. Rewald spoke with Rardin about his discussions with the alleged prince, and Rardin relayed this information to CIA headquarters.

Rewald visited Argentina and Chile during 1982. Argentina was embroiled in the Faukland Islands dispute with Great Britain, and after Rewald returned to Hawaii, he spoke with Rardin about his meetings with various prominent Argentinian businessmen. Rewald also visited Chile, and he informed Rardin about his discussions with various leaders of the Chilean military, which included a proposal to purchase a Chilean bank. Later that year, Rewald met in Hawaii with a reputed associate of Rajiv Ghandi, son of then-Prime Minister Indira Ghandi. Rajiv's associate spoke with Rewald about India's purported desire to purchase military equipment. Rewald spoke with Rardin about this matter, and he informed CIA headquarters. Rewald also spoke to Rardin about his knowledge of other countries' desires to purchase military weaponry.

Rewald's travels also brought him to the Far East location for which he provided backstopping cover. He met with the CIA agents and they expressed an interest in any intelligence Rewald could provide.

Rewald sought to document these and other adventures by introducing written reports of Rardin's daily activities, which documented and briefly summarized numerous meetings between Rewald and Rardin. Rewald argued that these reports were essential to defeat the CIA's claim that Rewald only provided incidental cover for unrelated CIA covert activities. But the district court concluded that because so many of the entries on the activity reports made reference to specific covert activities, their introduction would confuse the issues and mislead the jury. The court noted that Rardin would be available to testify at trial, and that it would consider use of the documents to impeach Rardin should a dispute arise at trial over the frequency of Rardin's contacts with Rewald.

The district court also rejected Rewald's renewed attempt to introduce numerous classified documents formerly in Rewald's possession that generally dealt with specific intelligence requirements for certain countries Rewald had visited. The court rejected Rewald's argument that his mere possession of these classified documents demonstrated his trusted relationship with the CIA.

The district court also ruled on other pretrial evidentiary matters, including the appropriateness of government-supplied substitutions and redactions for classified documents, and several government in limine motions. The court accepted most of the government's redactions and substitutions. Rewald successfully moved the court to reject the government's attempt to preclude admission of statements made in the media; to reject the government's last-minute attempt to exclude evidence previously ruled admissible; to reject the order proposed by the government to limit trial evidence and enter an order more narrowly focused on its pretrial rulings; and to

grant in part Rewald's motion to modify a government substitution.

### D

Federal Rule of Evidence 402 provides that all relevant evidence generally is admissible. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 permits a district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In the *Miller* case, this court recently reviewed a district court's ruling that classified evidence was inadmissible under Rules 401 and 403. The defendant was charged with transferring classified documents to the Soviet Union. He sought to introduce numerous classified documents discovered in searches of his two residences and his work desk. *Miller*, 874 F.2d at 1276. He argued that the various documents were relevant to his theory of defense because they tended to indicate "that he was not collecting classified documents in order to pass them to the Soviet Union, but rather that he was a disorganized 'pack-rat' who simply failed to properly file all of his documents." *Id.* The district court agreed that the defendant's "pack-rat" defense was viable, but it concluded that the contents of the documents were irrelevant. The *Miller* court affirmed, finding that "introduction of the entire contents of all of these documents might confuse and mislead the jury and waste the court's time." *Id.* at 1277.

The *Miller* court relied extensively upon the Second Circuit's decision in *United States v. Wilson*, 750 F.2d 7 (2d Cir.1984), cert. denied, 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986). In *Wilson*, the defendant's sole contention on appeal was that "the district court erred in precluding him from proving in detail his alleged participation in certain classified intelligence and counterintelligence activities of the United States." *Wilson*, 750 F.2d at 8. The defendant in *Wilson* was convicted of attempted murder, obstruction of justice, and witness tampering, among other crimes. He had attempted to arrange the assassination of various witnesses who were to testify against him at several criminal trials. He argued that evidence of his previous covert intelligence activities was relevant to proving that he had no motive for tampering with these witnesses, because he reasonably believed that convictions were unlikely in light of his previous activities on behalf of the United States. *Id.* at 9.

The district court in *Wilson* ruled that the defendant would be permitted to introduce evidence of his previous employment with government intelligence agencies and of his involvement in covert operations. But the district court ruled that pursuant to Rule 403, it would not permit evidence of the details of the defendant's previous intelligence operations. The appellate court examined for itself the classified material at issue, and concluded that the district court did not abuse its discretion in rejecting prejudicial, confusing, or misleading evidence of the defendant's specific covert operations. *Id.* at 9.

### E

■ This court has examined each and every classified document filed by Rewald in this appeal.[7] We are least troubled by

7. Rewald originally filed hundreds of pages of classified documents without any index and without citation to the record below. His unclassified excerpts of record also fail to contain an index. *See* Ninth Circuit Rule 30–1.5 (requiring an index). Additionally, Rewald's classified brief fails to cite to the record, as required by Fed.R.App.P. 28(a)(3)–(4) & (e). This court ordered Rewald to refile his classified appendix in a manner permitting us to judge the district court's rulings on particular documents. The district court's various evidentiary rulings refer to each classified document by reference to a numbering sequence. While Rewald refiled his classified exhibits in response to our order and included an index, he has failed to identify the classified documents by citation to the record below.

the district court's exclusion of documents and other evidence relating to the intelligence activities of persons other than Rewald. Specifically, the activities of CIA agents for whom Rewald provided backstopping services are minimally probative of Rewald's claim that the CIA instructed him to spend investor money extravagantly. The same is true for the various CIA agents who invested in Bishop Baldwin at Richardson's urging. The district court did not abuse its "wide discretion" in determining that the slight probative value of this evidence was substantially outweighed by the danger of confusion of the issues and misleading the jury. *Hill v. Rolleri,* 615 F.2d 886, 890 (9th Cir.1980).

· The foreign intelligence activities of Rewald and several others at Bishop Baldwin is a much closer question.[8] The specific details of Rewald's meetings with foreign businessmen and government officials lend some credence to his contention that he was a bona fide CIA agent. Likewise, if Rewald were permitted to establish that his activities mirrored the requirements provided to him by the CIA, the jury might find his CIA agent defense more credible. However, the ultimate anchor of Rewald's defense is not that he was a CIA agent, but that the CIA ordered him to spend investor money. Thus, evidence of Rewald's specific intelligence activities is twice removed from his defense that he lacked specific intent to defraud the investors. Rule 403 recognizes that as the probative value of evidence decreases, the potential increases for it to be substantially outweighed by the dangers identified in the rule. *See Lucas v. Bechtel Corp.,* 800 F.2d 839, 849 (9th Cir.1986). *Miller* and *Wilson* establish that not even bona fide government agents necessarily are permitted to divulge classified information of specific intelligence activities.

The district judge excluded this evidence on the basis that the details of Rewald's specific intelligence activities and those of his associates did not prove that the CIA had *instructed* Rewald to spend Bishop Baldwin investor money to cultivate foreign intelligence contacts. Our independent review of the relevant documents supports this assessment. While evidence of his intelligence activities undoubtedly has some tendency to make this proposition more likely than not, it also would require delving into particular transactions and events that are far afield from this prosecution.

Initially, extensive documentary and testimonial evidence of Rewald's foreign travels may have considerably delayed an already lengthy trial. Rule 403 establishes that considerations of undue delay may justify the exclusion of relevant evidence. *See Poling v. Morgan,* 829 F.2d 882, 888 (9th Cir.1987). Of course, the government would be permitted to offer rebuttal evidence, thereby further drawing out the proceedings. *See Ford v. Sharp,* 758 F.2 1018, 1023 (5th Cir.1985). These developments would have turned the jury's attention away from the issues of Rewald's misrepresentations and the CIA's alleged instruction to him to pilfer investor funds, to events transpiring many hundreds of miles away with little or no connection to this case. The district judge faced a quandary. Admission of this evidence posed the substantial risk of permitting the trial to degenerate into an unfocused presentation of facts and testimony that would confuse the issues and mislead the jury. *See Lucas,* 800 F.2d at 849.

The jury heard from the government's own witnesses that the CIA provided Rewald with specific intelligence requirements and that Rewald traveled to foreign countries and reported back to the CIA

---

Rewald's failure to comply with these rudimentary procedural obligations has made our task significantly more onerous. Of course, we are not required to search the record for error on his behalf. *See Herrera v. United States,* 280 F.2d 888, 889 (9th Cir.1960). Moreover, his failure to cite to the record below would justify rejecting his claim entirely. *See infra,* note 24.

Nonetheless, we have done our best to match the documents to the district court's rulings below.

**8.** Rewald had introduced several Bishop Baldwin employees to the CIA and suggested that they could provide information learned through their foreign travels. *See supra* page 845.

about his meetings and observations. These witnesses also testified to their frequent contact with Rewald and their high regard for his usefulness and character. The district court permitted Rewald to introduce all evidence having any tendency to prove that the CIA was aware of the expenditure of investor funds for CIA purposes. Under these circumstances, we cannot say that the district court abused its discretion by excluding evidence of the specific covert intelligence activities engaged in by Rewald and other Bishop Baldwin employees.

## IV

Rewald raises other issues concerning the exclusion of evidence and the district court's conduct of CIPA proceedings. We address his arguments below.

### A

■ Rewald argues that he was denied his constitutional right to be present at the court's June 5, 1985, CIPA section six hearing.[9] Specifically, he faults the district court for not obtaining an "on the record" waiver by Rewald of his alleged constitutional right to be present at this hearing. The court held this hearing in camera with both government and defense counsel present. Rewald did not attend this hearing; Rewald earlier had sought and obtained bail conditions that permitted him to reside in Los Angeles, California, where he had a job paying $1,000 per week.

"The right of an accused to be present at his trial is an ancient and well-established one which draws on several constitutional sources[;]" namely, the due process clause and the confrontation clause. *Badger v.*

*Cardwell,* 587 F.2d 968, 970 (9th Cir.1978). Assuming without deciding that Rewald had a constitutional right to attend the pretrial CIPA proceedings, he waived his rights through his voluntary absence.

Rewald never informed the trial court that he wanted personally to be present at any CIPA hearings, and Rewald's counsel never objected to Rewald's absence. Certainly the district court never entered any order denying Rewald's asserted right to be present.[10] Under these circumstances, we find that Rewald has waived any right to be present. *See United States v. Gagnon,* 470 U.S. 522, 528, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486 (1985) (district court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend" under Fed.R.Crim.P. 43); *Diaz v. United States,* 223 U.S. 442, 452, 32 S.Ct. 250, 252, 56 L.Ed. 500 (1912) (voluntary absence may waive constitutional right to be present); *United States v. McClendon,* 782 F.2d 785, 788–89 (9th Cir. 1986); *United States v. Veatch,* 674 F.2d 1217, 1225 (9th Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *cf. United States v. Martinez,* 883 F.2d 750 (9th Cir.1989) (court may infer waiver of defendant's right to testify and court has no obligation to inquire into whether the defendant knowingly and intelligently waived this right).[11] Moreover, Rewald fails to identify any prejudice arising from his absence. *See United States v. Kupau,* 781 F.2d 740, 743 (9th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986).

### B

■ Rewald argues that the district court improperly denied him "an opportuni-

9. Rewald also quotes CIPA section two in an apparent attempt to provide statutory authority for his required presence at the CIPA section six hearing. However, section two concerns only a pretrial conference, not a CIPA section six hearing.

10. In his opening appellate brief, Rewald succinctly summarizes his argument: "there is no waiver from REWALD (himself) as to his appearance at CIPA *ever.*" In his reply brief, he argues that "[t]he court actively excluded him" from the June 5 hearing and that he was "out-

side the door and denied entry." Rewald fails to provide any citation to the record to substantiate this claim made for the first time in his reply brief. Nonetheless, this court has reviewed the record of this hearing and concludes that Rewald's factual assertion is without support. Moreover, "appellants cannot raise a new issue ... in their reply briefs." *Golden v. Pacific Maritime Ass'n,* 786 F.2d 1425, 1429 (9th Cir. 1986).

11. Rewald concedes in his reply brief that he knew about the June 5 hearing.

ty to either verballey [sic] or in writing set forth the proposed relevancy of each document" that he identified in a CIPA section five notice. However, the district court certainly did not restrict Rewald's ability to argue *in writing* the relevancy of the classified documents he identified in his various CIPA section five notices. Rewald never sought to submit a memorandum of law in support of the relevance of his CIPA notice.

Rewald's objection refers to the district court's conduct of oral argument at the June 5 CIPA hearing. At this hearing, the district court initially expressed its view that Rewald had a full and adequate opportunity to address the relevance of particular documents in his CIPA section five notice. The government endorsed this view.

■ CIPA section five requires a defendant to provide a "brief description of the classified information" in his notice. We have interpreted this requirement to be satisfied where the description informs "[t]he government ... exactly to which documents [the defendant] was referring, and [to] what information was contained in them." *Miller*, 874 F.2d at 1276. Accordingly, CIPA section five does not require a defendant to provide detailed argument in support of the relevance of particular noticed documents in the notice itself. Thus, the district court was mistaken in its initial assessment that the CIPA section five notice was the primary vehicle for addressing the relevance of the documents.

The district court, however, did not adhere to its initial understanding of CIPA. Indeed, the court permitted extensive oral argument, lasting from roughly 10:00 a.m. until 7:00 p.m., on the relevancy of numerous documents. The court expressed its

desire to focus argument upon categories of documents because it already had reviewed each classified document noticed by Rewald's CIPA section five notice. Moreover, Rewald does not identify any particular argument about relevancy that the district court prevented him from making. Under these circumstances, the district court did not abuse its discretion in structuring oral argument in the way it did.

## C

Rewald also raises various other points in his brief. He contends that the district court prohibited his proposed "expert witness/accountants" from testifying although they could have documented that every expenditure was for the CIA's benefit. Rewald does not cite to any portion of the record where the court excluded these alleged defense witnesses, nor does he provide any argument demonstrating error in the court's purported ruling.

Rewald also objects to the alleged exclusion of evidence that in fact was admitted at trial. Specifically, the court permitted introduction of the Hong Kong capital flight study, the documents indicating that Richardson's cover was associated with the oldest families in Hawaii, and Bishop Baldwin's establishment of foreign offices.

## V

■ Rewald argues that he was denied a sixth amendment right to counsel of his choice by the district court's decision to disqualify attorney A. Brent Carruth. Carruth, who serves as counsel of record for this appeal, devotes a considerable portion of Rewald's opening brief to this issue.[12]

---

**12.** Rewald argues that this court would have to "overrule itself" if we affirm the district court's decision to disqualify Carruth, because we rejected "this exact same argument" in our previous order appointing Carruth as Rewald's counsel for this appeal. He is mistaken.

The government objected to the Federal Public Defender's Office's motion to withdraw as counsel of record, and to Rewald's motion for the appointment of Carruth, on the basis that Carruth's unfamiliarity with the mountainous record on appeal would cause undue delay. While the government also argued that Rewald's

motion was an improper attempt to circumvent the district court's disqualification order, it did not argue that Carruth would be subject to a conflict of interest as appellate counsel. Accordingly, our order appointing him does not speak to the merits of Carruth's conflict of interest at trial.

Additionally, we reject Rewald's sixth amendment claim on grounds that are not incompatible with Carruth's status as counsel on appeal. Moreover, the district court has substantial discretion in this matter. Our present ruling,

Rewald stresses the importance of having Carruth's services, because of his alleged expertise with CIPA procedures and prosecutions involving the CIA. Rewald was represented at trial by three court-appointed attorneys: Chief Public Defender Michael Levine, Assistant Public Defender Brian Tamanaha, and private practitioner Wayne Parsons.

### A

Rewald sought to have Carruth appointed by the court under the Criminal Justice Act, 18 U.S.C. § 3006A, which provides, *inter alia*, for the appointment of counsel for indigent felony defendants. On October 15, 1984, the magistrate appointed Carruth, but the district court terminated the appointment on November 23, 1984, after the government had moved for his disqualification on the grounds that he would be subject to a conflict of interest.

At the time Rewald sought his appointment, Carruth was representing Richard Craig Smith in a criminal prosecution in the Eastern District of Virginia. Indeed, Rewald met Carruth through this representation; Carruth contacted Rewald in the course of preparing Smith's defense. Smith was charged with espionage for allegedly disclosing classified information to an agent of the Soviet Union. *Smith*, 780 F.2d at 1103–04. Smith's defense was that he believed he was working for and at the direction of the CIA at the time he disclosed the information.

Smith claimed that two individuals claiming to be CIA agents had contacted him and enlisted his help in disseminating meaningless and confusing information to the Soviets. *Id.* at 1104. Smith alleged that these two individuals had provided him with a telephone number where messages could be left. The telephone number was

associated with Bishop Baldwin. *United States v. Smith*, 592 F.Supp. 424, 445 (E.D. Va.1984). By "confirming" Bishop Baldwin's status as a CIA proprietary organization, Rewald's testimony would bolster Smith's defense.

### B

The sixth amendment recognizes a qualified "right to select and be represented by one's preferred attorney." *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). However, Rewald evidently overlooks an established limitation on this right: only "individuals who can afford to retain counsel have a qualified right to obtain counsel of their choice." *United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir.1984). "Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel." *Caplin & Drysdale, Chartered v. United States*, —— U.S. ——, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989). Rewald's brief concedes that he "was unable to hire a private attorney, because he lacked the money." [13]

This does not end the matter, however, because on July 25, 1985, Rewald sought to retain Carruth and have him substituted as counsel of record. Rewald alleges that unnamed persons established a fund to hire Carruth and that he was "no longer indigent." Rewald's alleged economic resources vested him with the qualified right to counsel of his choice.

The government opposed the substitution and again sought to disqualify Carruth on the grounds that he had a conflict of interest. The district court agreed with the government and denied Rewald's motion for substitution on July 30, 1985, without a hearing. [14]

---

therefore, must be considered in the context of our limited review. Rewald also ignores this court's earlier denial of Carruth's application for a writ of mandamus compelling the district court to permit Carruth's substitution as trial counsel. *See U.S. v. Rewald*, No. 85–7428 (filed 8/1/85). Thus, to the extent that this court has spoken on this matter, it is not to Rewald's liking.

**13.** An indigent defendant provided appointed counsel, of course, is entitled to the effective assistance of counsel. *See Wheat*, 108 S.Ct. at 1696–97.

**14.** Although Rewald assured the district court that he had the financial capacity to retain private counsel, he did not seek the substitution of any other private counsel, and he continued to

Rewald's last-minute attempt to substitute trial counsel less than two weeks before trial is an unlikely candidate for reversal. His request certainly would have entailed a considerable postponement of trial. The district court already had granted two previous motions by Rewald to continue trial. As the district court only ruled on the merits of the government's disqualification motion, however, we must consider Rewald's opposing arguments.

## C

■ Rewald begins by stressing his alleged voluntary, knowing, and intelligent waiver of any conflict of interest. Citing our decision in *United States v. Partin,* 601 F.2d 1000 (9th Cir.1979), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980), Rewald argues that the district court was obligated to accept his waiver of his right to the assistance of counsel free from a conflict of interest. In *Partin,* we stated that "[i]t is clear that a defendant may waive his right to assistance of counsel who is free from any conflict of interest." *Id.* at 1007.

The court below directed Rewald's appointed counsel to inform him of the risks of choosing Carruth, and Rewald met with his attorney to discuss this matter. Rewald was told that "no competent defense attorney would ever allow Mr. Rewald to testify as a witness before his own trial—if ever." Carruth, of course, desired to have Rewald testify at Smith's trial. Despite being advised of the risks, Rewald informed the court that he desired to have Carruth serve as his counsel.

Rewald's waiver of Carruth's conflict of interest is not dispositive. "Federal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 108 S.Ct. at 1697. The defendant in *Wheat* advanced the very same argument as Rewald; namely, that a

valid waiver "cures any problems created by multiple representation." *Id.* Rejecting this argument, the Court stated that "no such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice." *Id.*

In *Wheat,* the Court approvingly cited this court's conclusion that "trial courts confronted with multiple representations face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." *Id.* 108 S.Ct. at 1698. Multiple representation may lead to a claim of ineffective assistance of counsel, while a "refusal to accede to the multiple representation" may lead to a claim of denial of counsel of choice. *Id.* A criminal defendant's right to select defense counsel is limited because "multiple representation of criminal defendants engenders special dangers of which a court must be aware." *Id.* 108 S.Ct. at 1697.

The Supreme Court concluded in *Wheat* that "the District Court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict of interest may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 1699. Applying this standard of review, the Court concluded that the trial court had not "exceeded the broad latitude which must be accorded it in making this decision." *Id.*

*Wheat* cannot be distinguished on the basis that it involved the simultaneous representation of codefendants in a single trial. While the attorney in *Wheat* sought to represent two defendants who could have been tried together,[15] the Court emphasized the attorney's prior representation of a third codefendant who had pleaded guilty. "Conflicts of interest can arise both in cases of simultaneous representation and successive representation, though it gener-

receive free legal representation under the Criminal Justice Act. Indeed, he continues to receive free legal representation on appeal.

15. One defendant had offered to plead guilty but the district court had not accepted the plea at the time the attorney sought the multiple representation. *Id.* 108 S.Ct. at 1694.

ally is more difficult to demonstrate an actual conflict of interest resulting from successive representation." *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1252 (9th Cir. 1989). While more difficult to demonstrate, this court has found ineffective assistance of counsel as a result of conflicts of interest in successive representations. *See id.; Mannhalt v. Reed,* 847 F.2d 576 (9th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988).

### D

Carruth's representation of Rewald and Smith would have constituted a hybrid of simultaneous and successive representation, as he would have rendered simultaneous representation in different proceedings. However it is classified, Carruth's representation posed a potential conflict of interest. "[C]onflicts of interest arise if an attorney reveals privileged communications of the former client, or otherwise divides his loyalties so that he is incapable of diligently representing his client." *Wheat,* 813 F.2d at 1402. The sixth amendment "includes the right to be represented by counsel whose loyalties are undivided." *Partin,* 601 F.2d at 1006.[16] A defendant justifiably expects that a lawyer "will use every skill, expend every energy, and tap every legitimate resource in the exercise of

independent professional judgment on behalf of the client and in undertaking representation on the client's behalf." *Thomas v. Municipal Court,* 878 F.2d 285, 289–90 (9th Cir.1989).

Rewald argues that, at the time he sought to retain Carruth, it was clear that Smith's trial would follow his own. The district court rejected this very argument, reasoning that a decision was expected shortly from the Fourth Circuit's en banc panel,[17] and that, as Rewald's trial was expected to be lengthy, there was a "strong likelihood that the two trials will overlap." Additionally, the district court did not err in concluding that Carruth already had displayed questionable judgment in October, when Rewald's testimony for Smith may have preceded his own trial.[18] The federal public defender had informed Rewald that Carruth's representation posed the potential conflict of interest that Carruth might be "so dedicated to Mr. Smith's representation that he will use this case as a sham in order to obtain documents in this case, which he will then use to defend Mr. Smith with, but which may hurt Mr. Rewald." While we do not for a moment assail Carruth's integrity, the *potential* for a conflict of interest is determinative. Accordingly, the district court did not err in this case.[19]

---

**16.** To the extent *Partin* implied that a defendant always may waive his attorney's conflict of interest, it is inconsistent with the Supreme Court's subsequent decision in *Wheat.*

**17.** As a result of extensive pretrial evidentiary issues that culminated in an en banc review of the district court's discovery order, *see Smith,* 780 F.2d at 1104, Smith's trial did not actually begin until April 1986.

**18.** Rewald claims that it is significant that he already had testified in certain pretrial CIPA proceedings in the *Smith* case. This fact, however, hardly is dispositive of the propriety of Carruth's advice to Rewald to take the stand *again,* subject to the extensive cross-examination of a government prosecutor in a full-blown trial. Despite Rewald's earlier testimony, Rewald's appointed defense counsel advised him that no reasonable defense attorney would permit his client to testify in another criminal trial in advance of his own trial. Carruth, however, proposed to have Rewald do just that.

Finally, we reject Rewald's invitation to compare his subsequent testimony in the 1986 *Smith*

trial with the potential conflicts of interest identified by the government in 1984. A district court is vested with broad latitude in this area precisely because "[u]nfortunately for all concerned, [it] must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat,* 108 S.Ct. at 1699. Accordingly, Rewald's request that we take judicial notice of the *Smith* trial is denied.

**19.** Rewald's reliance upon *United States v. Washington,* 797 F.2d 1461 (9th Cir.1986), is misplaced. *Washington* stated that "[w]e have grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights." *Id.* at 1466. *Washington* involved the appearance of impropriety raised by a defense counsel's prior employment as a government prosecutor. There was no claim,

## VI

Rewald argues that his court-appointed lawyers rendered ineffective assistance of counsel. "[T]he customary procedure in this Circuit for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255, and this Court has been chary of analyzing insufficiency of counsel claims on direct appeal." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir.1984) (citations omitted), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). "Challenge by way of a habeas corpus proceeding is preferable as it permits the defendant to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." *United States v. Pope*, 841 F.2d 954, 958 (9th Cir.1988).

An exception to the general rule in this circuit permits consideration of an ineffective assistance of counsel claims on direct appeal where "the defendant's legal representation was so inadequate as obviously to deny him his sixth amendment right to counsel." *United States v. Wagner*, 834 F.2d 1474, 1482 (9th Cir.1987); *United States v. Kazni*, 576 F.2d 238, 242 (9th Cir.1978). Our review of Rewald's claim, however, reveals no basis for considering it on direct review. Rather, "[t]he record before us illustrates precisely why ineffective assistance claims cannot generally be evaluated on direct appeal." *Wagner*, 834 F.2d at 1483.

Lacking the development of facts outside the record, Rewald's ineffective assistance claim fails to identify material, specific errors and omissions that prejudiced his defense. Such a showing is the hallmark of a successful ineffective assistance claim. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Rewald would have this court presume prejudice from the circumstances surrounding his defense.[20] This we decline to do. Instead, Rewald is free to pursue his claim in a subsequent habeas corpus proceeding.

## VII

Prior to trial, Rewald moved for the disqualification of prosecutor Peyton, alleging that Peyton had an apparent conflict of interest.[21] Peyton was the former chief of

---

however, that the attorney's representation posed a potential or actual conflict of interest with his prior representation. *Id.* at 1466.

Rewald's reliance upon *Washington* is grounded upon his incorrect statement that the district court disqualified Carruth solely upon an appearance of conflict of interest. In fact, the court concluded that "this serious, actual conflict of interest gave rise to far more than a mere appearance of impropriety." The Supreme Court's *Wheat* decision teaches that an actual or potential conflict of interest poses a serious challenge indeed to the integrity of the judicial process. Accordingly, *Washington* is not controlling.

**20.** Tamanaha and Levine had several run-ins with the district judge during trial, and he even cited them with contempt for certain behavior. For instance, the district judge was furious at what he viewed as defense counsel's deliberate disobedience of an order of the court prohibiting the defense from obtaining a handwriting exemplar from witness Mason. Defense counsel had Mason served with a subpoena outside the courtroom and obtained his signature on an acknowledgment. The district judge advised defense counsel that he would issue an order to show cause.

The inappropriateness of presuming prejudice from this incident is highlighted by Tamanaha's superb performance at trial immediately afterwards. During Mason's testimony, Tamanaha relentlessly sought to have the district court overrule its pretrial CIPA order excluding documents indicating that the CIA had described Richardson's cover as being a company associated with some of the oldest families in Hawaii. The defense viewed these documents as essential to show that the CIA had created Bishop Baldwin. Tamanaha prevailed and the district court admitted the evidence over the strong opposition of government counsel.

**21.** Rewald also moved for dismissal of the indictment and disqualification of Peyton on the grounds that Peyton's representation of the United States in certain civil proceedings involving Rewald and Bishop Baldwin gave rise to an actual conflict of interest. However, Rewald does not repeat this claim on appeal. While discussing another point, Rewald does cite Peyton's alleged admission to the bankruptcy trustee that he was "[c]ounsel for the CIA." But Rewald does not argue that Peyton's actions in the civil proceedings themselves produced a conflict of interest. Rather, Rewald cites Peyton's alleged statement as an admission that he actually was employed by the CIA. *See, infra*, note 23.

litigation for the CIA. Rewald also claims that the government introduced false evidence at trial, and that the prosecutor made improper remarks during opening and closing arguments.

■ Rewald's motion to disqualify Peyton centered on the alleged appearance of impropriety of a former CIA attorney arriving in Hawaii in the immediate aftermath of Bishop Baldwin's collapse to take charge of Rewald's prosecution. As articulated by Rewald: "The appearance to the public was that Peyton, a CIA chief attorney, was sent to help the CIA cover up embarrassing secret information, information that could cause it civil and possible criminal liability, due to 400 angry investors." In short, Rewald argues that it appeared that Peyton's arrival in Hawaii and assignment to the Rewald case was no coincidence.

Rewald has failed, however, to identify any evidence controverting the government's explanation of the circumstances surrounding Peyton's selection as the government's lead representative in the Bishop Baldwin affair. The government's affidavits established that Peyton came to Hawaii at the time of Bishop Baldwin's collapse quite by chance. While the newspapers expressed skepticism about this coincidence, no evidence undercuts the government's account. We refuse to overturn Rewald's conviction based upon un-

founded gossip and speculation, fueled in part by himself.[22] Absent evidence of actual prosecutional misconduct, Peyton's prior affiliation with the CIA troubles us not the least. Similarly, we reject Rewald's argument that he was entitled to an evidentiary hearing.[23]

Rewald also cites various instances of alleged prosecutorial misconduct. We review this issue de novo. *See United States v. Spillone,* 879 F.2d 514, 520 (9th Cir. 1989).

■ Rewald argues that government prosecutors introduced certain evidence without a good faith belief in the truth of the evidence. It is an established tenet of the due process clause that "the deliberate deception of the court by the presentation of false evidence is incompatible with rudimentary demands of justice." *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir.1989). "Thus, if the prosecution knowingly uses perjured testimony, or if the prosecution knowingly fails to disclose that testimony used to convict a defendant was false, the conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the jury verdict." *Id.* Absent this reasonable likelihood, the government's knowing use of perjured testimony does not warrant relief. *Id.* at 456.

■ This court has reviewed carefully the various instances where Rewald alleges

---

**22.** Rewald attached as an exhibit to his motion in the district court a copy of a newspaper article in which he was quoted as questioning the circumstances surrounding Peyton's appointment.

**23.** Rewald also argues that "[a]t the very least," the district court should have held an evidentiary hearing on Peyton's alleged appearance of impropriety. However, Rewald failed to present factual allegations by affidavit that, if true, would warrant relief. *See United States v. Benjamin,* 852 F.2d 413, 423 (9th Cir.1988); *United States v. Irwin,* 612 F.2d 1182, 1187 (9th Cir.1980). Rewald's brief does cite to the subsequent testimony at trial of defense witness Ralph McGehee, who stated that in May 1983, he received approval from Peyton, allegedly on behalf of the CIA, to travel to Cuba and Nicaragua. As a former CIA agent, McGehee generally sought CIA approval before traveling to disfavored countries.

Rewald now argues that McGehee's testimony proves that the government misrepresented Peyton's relationship with the CIA following the termination of his employment in 1981. While McGehee did identify Peyton, the most blatant misrepresentation on this subject is Rewald's. His brief states that the following occurred after McGehee mentioned Peyton: "[Prosecutor] Greenberg immediately announced to the jury that Mr. Peyton had never never done that. Whereupon Mr. Levine called Mr. Greenberg a liar. The Court then interceded by cautioning Levine." Rewald's account of this altercation is pure fiction.

Rewald did not renew his motion to disqualify Peyton based upon McGehee's testimony. Such a motion would have given the trial court an opportunity to evaluate McGehee's credibility and recollection. Under these circumstances, McGehee's testimony provides no basis for questioning Peyton's affidavit.

that the government introduced false evidence without a good faith basis in its veracity. In certain cases, Rewald mischaracterizes the trial testimony, which fairly read is not false. For instance, Rewald states that Robert Miller of the SEC testified "that Rewald had *lied* on a September 2, 1976, disclosure statement to that agency by not listing a prior petty theft conviction." In fact, Miller accurately testified that Rewald had checked a box on the statement indicating that he had no prior convictions. Miller did not testify that Rewald lied on the statement. In still other examples, Rewald cites evidence supposedly inconsistent with government witnesses's testimony that is in fact not inconsistent.

In every instance, Rewald fails to demonstrate that the evidence affected the jury's verdict, or that the government lacked a good faith basis in the evidence it introduced. These defects are determinative. In some cases, defense testimony or cross-examination definitively corrected any error in a government witness's testimony. Accordingly, we conclude beyond a reasonable doubt that the evidence disputed by Rewald did not affect the jury's verdict. *See United States v. Polizzi,* 801 F.2d 1543, 1550 (9th Cir.1986).[24]

Finally, Rewald contends that the government made improper remarks in its opening statement and closing argument.

Rewald submits that, in its opening statement, the government improperly vouched for the credibility of certain witnesses, referred to Rewald's prior misdemeanor conviction, and committed "constant character assassination of Rewald."

"Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." *United States v. West,* 680 F.2d 652, 655 (9th Cir.1982) (quoting *United States v. Roberts,* 618 F.2d 530, 533 (9th Cir.1980), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981)). In addition, in extreme circumstances, a prosecutor's use of "unnecessary, vindictive, and harsh language" may require reversal where the remarks "are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Birges,* 723 F.2d 666, 671–72 (9th Cir.1984) (quoting *United States v. Gorostiza,* 468 F.2d 915, 916 (9th Cir. 1972)), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984).

By a wide margin, the record does not support Rewald's claims that the government vouched for its witnesses or engaged in character assassination of Rewald. Rewald cites only one instance of alleged vouching.[25] During its opening

---

**24.** Rewald refers to various other instances of allegedly perjured testimony without affording us the benefit of citation to the record on appeal. He also refers to certain matters that are not in the record on appeal. We decline to consider the merits of these arguments. *See* Fed.R.App.P. 28(a)(3)–(4) & (e); *Hamblen v. County of Los Angeles,* 803 F.2d 462, 464–65 (9th Cir.1986); *Assoc. Builders & Contr. v. Carpenters Vac., etc.,* 700 F.2d 1269, 1277 n. 11 (9th Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 94, 78 L.Ed.2d 101 (1983); *Mitchel v. General Elec. Co.,* 689 F.2d 877, 879 (9th Cir.1982).

Rewald's objection to the government's alleged failure to provide the grand jury with exculpatory information is meritless. *See United States v. Kennedy,* 564 F.2d 1329, 1335–38 (1977) (government need not present exculpatory evidence to the grand jury), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).

**25.** Rewald also argues that the government wrongly vouched for codefendant Sunlin Wong's credibility by referring to his guilty plea

in its opening statement. This reference was improper, according to Rewald, because the court subsequently refused the defense's requested limiting instruction that Wong's plea was inadmissible for the purpose of assessing Wong's credibility. In fact, the court's final instructions to the jury explained the limited relevance of Wong's guilty plea. *See, infra,* section IX. Additionally, the government's opening statement simply referred to the fact of Wong's plea agreement and did not infer or state that it was relevant to Rewald's guilt. Consequently, it is clear that Rewald's challenge goes to the limiting instruction, not to the government's opening statement. Rewald does not contend that Wong's plea was admitted into evidence improperly, but only that a requested limiting instruction was refused. Accordingly, the government's reference to the plea in its opening statement was not improper.

statement, the government stated that it would prove that Rewald had substantial unreported income through the testimony of Richard Yamamoto, "an officer from the [IRS], an expert witness who is a CPA, [who will] sit in this courtroom throughout the entire trial." The government then instructed Yamamoto to stand so that when he eventually testified, the jury would recognize that he had sat through the government's case. Neither the government's matter-of-fact statement that Yamamoto was an officer from the IRS, or its request that Yamamoto stand before the jury, constitute improper vouching.

■ Additionally, the government's opening statement fairly and accurately identified the evidence the government planned to introduce at trial. The government did not engage in character assassination, but rather a methodical assessment of the evidence. Rewald's objection to the government's reference to his prior misdemeanor conviction is also unpersuasive. In Count 84 of the indictment, the government charged Rewald with improperly filing with the SEC an application for registration as an investment advisor that failed to indicate a conviction for a crime involving fraudulent conversion or misappropriation of funds. Thus, Rewald's prior conviction was an element of the government's case-in-chief. Rewald cannot prevent the government from proving an element of its case-in-chief on the grounds that it is unduly prejudicial. Moreover, the court granted Rewald's pretrial motion to preclude the government from introducing evidence of the facts and circumstances surrounding the conviction.

■ The court also has reviewed the government's closing and rebuttal arguments, which Rewald asserts, among other things, made improper reference to his prior personal bankruptcy, and allegedly referred to him as a "lizard" and likened him to a "nine-headed, hydra-headed monster." [26] There was nothing improper about the government's reference to Rewald's filing of personal bankruptcy, which immediately preceded and arguably precipitated his move to Hawaii. In addition, the government's use of metaphors hardly violated the dictates of due process. The government only strove to depict Rewald's manipulative character by stating that, "like the little lizard slipping through the underbrush, he started to change his colors." Similarly, the government's reference to the nine-headed Hydra only served to introduce the government's theory that Rewald's statements "are represented by the nine groupings of lies."

## VIII

Rewald filed a pretrial motion pursuant to Fed.R.Crim.P. 21(a) [27] for a change in venue. He argued that the publicity about him and Bishop Baldwin was so pervasive and damaging that he could not possibly receive a fair trial in the district. On June 10, 1985, the court denied this motion without prejudice to seek a change in venue after voir dire. The defense renewed its motion for a change in venue both during and after voir dire. The district court denied these motions.

Jury selection began on August 5, 1985, and after the court excused persons demonstrating hardships, it commenced individual voir dire of prospective jurors in chambers. Counsel for the defense and the government were present, but the court excluded the news media. Prior to this questioning, both counsel discussed with the court which specific questions should be asked. The court asked each prospective juror about his or her exposure to media coverage about the case.

**26.** This is a misquote. The government stated "in Greek mythology, they had a monster called a Hydra, a nine-headed serpent...."

**27.** Rule 21(a) provides for a transfer when "there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial." Rule 21(a)'s require-

ment that a defendant receive a "fair and impartial trial" mirrors the dictates of the due process clause, and the familiar constitutional standards govern the Rule. *See United States v. McDonald,* 576 F.2d 1350, 1354–55 (9th Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978).

## A

A district judge has broad discretion in ruling on a motion for change in venue. *United States v. Flores–Elias*, 650 F.2d 1149, 1150 (9th Cir.), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981). Rewald does not challenge the district judge's rulings on challenges to particular jurors for cause.

A defendant must establish either presumed prejudice or actual prejudice to warrant a change in venue. *Harris v. Pulley*, 852 F.2d 1546, 1553–56 (9th Cir.1988). "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* at 1553. While such extraordinary publicity obviates the need to prove actual prejudice, "[t]he presumed prejudice principle is rarely applicable." *Id.* It is only applicable where "the pretrial publicity was so extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962). "When a Rule 21(a) motion is made 'the ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.'" *United States v. McDonald*, 576 F.2d 1350, 1354 (9th Cir.1978) (citation omitted).

In *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), the Supreme Court reviewed four previous decisions where the Court had "overturned a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage": *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The *Murphy* Court described *Irvin* as a case where the "rural community in which the trial was held had been subjected to a barrage of inflammatory publicity immediately prior to trial," including the defendant's confession to the charged murder and his unaccepted offer to plead guilty to avoid the death sentence. *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035. *Rideau* was a case in which the televised broadcast on three occasions of the defendant's 20–minute confession already had subjected the defendant to an inquisition before the community's 150,000 residents. *Id.* at 799, 95 S.Ct. at 2035. The trials in *Estes* and *Sheppard* were marked by a circus atmosphere as a result of media intrusions. *Id.*

## B

Rewald seeks to demonstrate presumed prejudice by reference to the results of the individual voir dire. He contends that the court disqualified 38.2% of the veniremen because they had been influenced by pretrial publicity. "The higher the percentage of veniremen admitting to a previously formed opinion on the case, the greater the concern over the reliability of the voir dire responses from the remaining potential jurors." *Harris*, 852 F.2d at 1555–56.

Rewald's arithmetic is incorrect. After excusing persons demonstrating hardships, the court conducted individual voir dire of sixty-six persons. Rewald requests that we also include one of the jurors excused for hardship, because he demonstrated bias from pretrial publicity. We agree. During individual voir dire, the court excused twenty-three persons for cause. The court subsequently excused an additional juror for cause. Assuming that all of these potential jurors were excused because of pretrial publicity, 37.3% would be the correct percentage. However, Rewald's assumption is erroneous.

Our independent review of the voir dire indicates that the court disqualified just eight jurors or 12% because of pretrial publicity. The others were excused for a variety of other reasons, including bias towards the government or defense, insufficient command of the English language, religious scruples, prior felony conviction,

illiteracy, and manic-depressive personality. In *Harris*, we rejected a claim of impermissible pretrial publicity where 18% of the veniremen admitted to a disqualifying prejudice, and we noted that the Supreme Court did the same in *Murphy*, where 26% were disqualified. *Harris*, 852 F.2d at 1556. The results of voir dire in this case do not create a presumption of prejudice.

■ Additionally, Rewald fails to identify anything approaching the prejudicial publicity found in *Irvin* or *Rideau*. The pretrial publicity in this case was predominantly factual in nature. *See Murphy*, 421 U.S. at 802, 95 S.Ct. at 2037; *Harris*, 852 F.2d at 1554. The majority of publicity Rewald complained about in his original motion for a change in venue was not broadcast or published in close proximity to the trial.[28] *See Murphy*, 421 U.S. at 802, 95 S.Ct. at 2037; *Harris*, 852 F.2d at 1554. While Hawaii is isolated, it is not a small or rural community. *See Rideau*, 373 U.S. at 724, 83 S.Ct. at 1418; *Irvin*, 366 U.S. at 719, 81 S.Ct. at 1640; *CBS v. United States District Court*, 729 F.2d 1174, 1181 (9th Cir.1984). Neither does the record demonstrate a circus atmosphere as a result of press intrusions.[29] Accordingly, we reject Rewald's argument that prejudice should be presumed.

### C

■ Rewald also faults the trial court for failing to question individually the veniremen approved on August 5 about an article in the afternoon edition of the *Honolulu Star–Bulletin*. This newspaper carried a long story on Rewald and Bishop Baldwin. The court inadvertently neglected to warn these jurors to avoid media coverage of the Rewald trial. However, on August 7, the court questioned these jurors as a group, asking whether anyone had read the article. Three jurors responded affirmatively, and the court conducted an individual voir dire of each in chambers. The court excused one person who stated that the article had biased him against Rewald.

Rewald's sole dispute with this procedure is the court's failure to question each person individually in chambers. We summarized the appropriate standard of review in *Hilliard v. Arizona*, 362 F.2d 908, 910 (9th Cir.1966):

> When a juror's impartiality is put in issue, the nature and extent of permissible inquiry of that juror, to ascertain if he has any opinions about the case and if so, whether such opinions would influence him and prevent him from finding his verdict solely in accordance with the evidence presented in Court, is a matter within the discretion of the trial judge and raises no constitutional issue unless the procedures followed are, as a whole, unreasonable and devoid of purpose to obtain an impartial tribunal.

■ In this case, the court understandably was concerned that the veniremen who had not been instructed to avoid the news media might have read the August 5th article. The court appropriately inquired of these veniremen about the article, and conducted individual voir dire of the three persons who stated that they had read the article. This procedure was not so devoid of purpose as to render Rewald's venire panel constitutionally suspect. Ac-

---

**28.** Rewald argues that "thousands of articles, radio and television broadcasts told that Rewald was a criminal, before the first juror was picked or the first witness sworn." Rewald's pretrial motion for a change in venue, however, identifies 295 newspaper and magazine articles. These articles were published between August 1983 through February 1985. The government notes that approximately 100 of these articles were published about two years prior to the trial, and approximately forty others were published nearly one year prior to the trial. Only twelve articles were published after January 1985. Rewald also complains about the preju-

dicial impact of other articles published subsequently, which we consider *infra*.

**29.** Rewald cites only one relevant incident. During closing arguments, the court permitted reporter Tanabe to sit in the front of the courtroom. The court stated that it desired to accomodate the media's desire to be present on the final day of trial and noted that the courtroom was full. This episode does not demonstrate that Rewald's trial had degenerated into a circus.

cordingly, we reject his challenge to the district court's procedure.[30]

## IX

■ Rewald contends that the trial court committed reversible error by failing to give a limiting instruction during Wong's testimony. During the government's direct examination of Wong, he stated that he had pleaded guilty to one count of mail fraud and one count of securities fraud in connection with his association with Bishop Baldwin. Rewald immediately moved the court for a cautionary instruction regarding the relevance of Wong's guilty plea. The district court refused to give a contemporaneous instruction. Yet Rewald fails to mention that the court instructed the jury as follows in its final charge:

> One witness, Sunlin Wong, has pleaded guilty to crimes arising out of the same events for which the defendant is on trial. This guilty plea is not evidence against the defendant and you may consider it only in determining Mr. Wong's believability. You should consider this witness' testimony with great caution, giving it the weight you feel it deserves.

R.T. at 10316.

■ "[W]hen the prosecution examines the codefendant as its witness in support of its case-in-chief, a question about the guilty plea is legitimate as the purpose is to support the reasonableness of the witness' claim to firsthand knowledge because of admitted participation in the very conduct which is relevant." *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir.1981). But we also have recognized that "[e]vidence of the guilty plea[ ] is amenable to misuse [because w]ithout instruction, it is possible the jury could use the plea[ ] as evidence of [the defendant's] guilt." *Id.* at 1006. Accordingly, where the prosecutor has elicited evidence of a codefendant's guilty plea, the trial court must provide "adequate cautionary instructions that make it clear to lay people that evidence of a witness' own guilty plea can be used only to assess credibility." *Id.; see also United States v. Smith*, 790 F.2d 789, 793 (9th Cir.1986).

In this case, the district court's final jury instructions included a cautionary instruction that explained that Wong's guilty plea was relevant only to assess his credibility and was not "evidence against the defendant." While "[t]he most effective practice would be to instruct the jury when the evidence of the plea is admitted, and again in final instructions," *Halbert*, 640 F.2d at 1006, the district court did not abuse its discretion by giving the cautionary instruction only in its final charge to the jury.

## X

■ Rewald argues that the district court failed to discharge its duties under the Jencks Act, 18 U.S.C. § 3500.[31] The government inexplicably does not respond in its brief to Rewald's argument. We conclude that the district court violated the Jencks Act by failing to examine certain documents *in camera* to determine whether they contain Jencks Act statements.

### A

The Jencks Act prohibits a defendant from compelling the production of a prior statement of a government witness in the

---

**30.** Rewald also questions the court's failure to ask the remaining veniremen whether they had read the article. On August 5, the district court had instructed these veniremen to avoid news media coverage of the trial. Accordingly, the court determined that it was unnecessary to ask these veniremen whether they had read the subsequent article. In any event, as Rewald did not request the trial court to question these veniremen, he has not preserved this issue for appeal.

Rewald did preserve his claim that the jury should have been polled and sequestered because of an August 14 article headlined "Rewald charm and $1000 create a love nest." Rewald admitted that his motions were not based "so much [on] the content of the article," but rather on its headline. The court noted that evidence of Rewald's illicit love affairs already had come out at trial. Under these circumstances, the court did not abuse its discretion.

**31.** Alternatively, Rewald argues that the district court erred under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As we agree with Rewald on the Jencks Act claim, we do not reach this alternative argument.

government's possession until "said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). But after a government witness's direct testimony, the government must produce, upon the defendant's motion, all of the witness' statements that "relate to the subject matter of the testimony of the witness." *Id.* at § 3500(b). The Jencks Act defines the term "statement" as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

*Id.* § 3500(e).

The Jencks Act established a statutory framework for the invocation of a criminal defendant's right, first recognized in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), to obtain for impeachment purposes statements previously made to government agents by government witnesses. *See Palermo v. United States*, 360 U.S. 343, 345, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287 (1959). While the Act limits which statements may be discovered and when they may be ordered to be produced, it essentially "reaffirms" the Supreme Court's holding in *Jencks*. *Campbell v. United States*, 365 U.S. 85, 92, 81 S.Ct. 421, 425, 5 L.Ed.2d 428 (1961).

In one of our early decisions interpreting the Jencks Act, *Ogden v. United States*, 303 F.2d 724, 732 (9th Cir.1962), we articulated "our understanding of the general obligations of the Court and of the parties in the administration of the Act." We noted that "[a]n affirmative duty is placed upon the trial court to secure the information which is necessary to a proper ruling on particular requests for production in the light of the statutory purposes." *Id.* at 733. We stated that the Act "was intended to protect government files from unwarranted disclosure, but it was equally its purpose to make available to the defendant certain of the materials in the possession of the government which might lead to the impeachment of government witnesses." *Id.* at 732–33.

### B

Following the government's direct examination of Sunlin Wong, Rewald moved, pursuant to the Jencks Act, for the production of so-called "302" reports prepared by the FBI agents who had interviewed Wong. A 302 report is an FBI agent's formal account of a witness interview filed on the FBI's Interview Report Form FD–302. *See United States v. Harris*, 543 F.2d 1247, 1249 (9th Cir.1976). Wong testified that he was interviewed by FBI agents on three or four occasions following Bishop Baldwin's collapse.

Wong testified that his interviews with the FBI agents proceeded in a question and answer format and that the agents took notes throughout the interviews. Occasionally, the agents asked Wong to repeat his answers. Wong testified that the agents diligently performed the task of writing down what he said. Wong did not recall whether a stenographer was present at any of his interviews. Wong testified that he never saw the agents' rough notes or a typed version prepared later.

Rewald also requested the FBI interview reports on one Jason Wong, who testified that the FBI had interviewed him on two occasions for two or three hours each. Jason Wong testified that the FBI agents took notes during these interviews, but that he had not seen the notes or a typed report.

Subsequent to its *ore tenus* rulings, the court entered a written order denying Rewald's request for the FBI 302 reports. The court stated that it denied Rewald's motion because he had not established "to the satisfaction of the court either that the report was approved or adopted by the witness, or that the report represents a substantially verbatim recital of the interview."

At trial, Rewald requested production of the FBI reports of Sunlin Wong's interviews on the basis that they could contain "a verbatim transcript, if nothing else." He also sought production of Jason Wong's FBI report on the same basis. Accordingly, Rewald sought the production of the reports under subsection 3500(e)(2), which includes an "other recording ... which is a substantially verbatim recital of an oral statement...." Conceivably, the FBI's reports of both these disputed interviews contain substantially verbatim accounts of Wong's oral statements.

### C

In the *Campbell* decision, the Supreme Court considered a district court's refusal to grant a defendant's request under the Jencks Act for production of a typed interview report prepared by an FBI agent. The agent prepared the report following his pretrial meeting with a government witness, and the defendant sought production of the report after this witness testified at trial. 365 U.S. at 90, 81 S.Ct. at 424. While the district court did review the interview report *in camera*, the Court faulted the district court for not acting on its "own motion" to question the FBI agent about the circumstances of the interview. *Id.* at 96, 81 S.Ct. at 427. Specifically, the Court held that the district court should have taken extrinsic evidence on the question of whether the report was producible under either subsection (e)(1) or (e)(2). *Id.* at 93–95, 81 S.Ct. at 425–27. Central to the Court's ruling was the holding that the Act

> implies the duty in the trial judge *affirmatively* to administer the statute in such way as can best secure relevant and available evidence necessary to decide between the directly opposed interests protected by the statute—the interest of the Government in safeguarding government papers from disclosure, and the interest of the accused in having the Government produce 'statements' which the statute requires to be produced.

*Id.* at 95, 81 S.Ct. at 426 (emphasis added).

This court also has recognized that "handwritten or rough interview notes taken by a government agent during a criminal investigation" may contain substantially verbatim recitals producible under the Jencks Act. *Harris*, 543 F.2d at 1250. Indeed, in *Harris* we held that the FBI must preserve its original interview notes in order to insure that the courts are not deprived of the ability to judge for themselves whether a document contains a Jencks Act statement.

In *Ogden*, we stated that "[l]ike any other 'statement,' an FBI Interview Report is producible under the Act as a 'statement' of the witness interviewed if ... the report contains a 'substantially verbatim recital' of a witness's oral statement and is prepared contemporaneously with the interview." *Ogden*, 303 F.2d at 735. Of course, reports that only contain the interviewing agent's "epitomization, interpretation, or impression of an interview are not producible...." *Id.; see also United States v. Allen,* 798 F.2d 985, 994 (7th Cir.1986); *United States v. Starusko,* 729 F.2d 256, 263 (3d Cir.1984). But the task of characterizing the report is for the court, not the government. *Ogden,* 303 F.2d at 737; *United States v. Johnson,* 521 F.2d 1318, 1320 (9th Cir.1975); *see also United States v. Allen,* 798 F.2d 985, 994 (7th Cir.1986) ("the *presumption* should be that the district court should hold an *in camera* hearing" where the parties dispute whether "something is a Jencks Act statement").

One defendant in *Ogden* moved for the production of an FBI interview report on the basis that a witness testified that "he had been interviewed by FBI agents and had observed them taking notes." *Id.* at 736. Based upon this "prima facie showing of the prior existence of a producible statement," the *Ogden* court concluded that it was error to deny the defendant's motion for further inquiry into the nature of the notes. *Id.* at 736–37; *see also United States v. McSweaney,* 507 F.2d 298, 300 (9th Cir.1974) ("the note-taking at the first interview has not been sufficiently explained"). The court stressed the need for judicial oversight because the defendant is

peculiarly ignorant of the circumstances of a government witness's interview. *Id.* at 737.[32]

D

In this case, after Rewald moved for production of the FBI 302 reports, the district court conducted a short voir dire of witness Sunlin Wong. The court asked Wong whether he had reviewed the rough interview notes or any transcript of the notes. After Wong replied negatively, the district court asked Wong whether he had "ever adopted any of those notes." When Wong replied that he had not, the district court denied Rewald's Jencks Act motion.

It is clear that the district court's ruling considered the production of the documents only under subsection (e)(1), which includes a written statement "signed or otherwise adopted or approved by" the witness. The court failed, however, to consider whether the 302 reports contained substantially verbatim recitals of Wong's interviews, producible under subsection (e)(2). This error is evident in the court's response to Rewald's request that the 302 reports be produced so that Wong could review them to determine whether "the FBI agents have taken down exactly what he told them."[33] The district court stated that this was a "collateral matter," and that "the accuracy of the FBI

taking those notes is not an issue before this Court." The court also denied Rewald's request for production of Jason Wong's interview reports on this basis.

Under the Jencks Act, of course, the accuracy of the FBI's reports most certainly is an issue before the district court where a defendant contends that the reports contain a substantially verbatim recital of a government witness's interview. Rewald sought to prompt further judicial inquiry into this matter; the court's misunderstanding of Jencks Act foreclosed it.[34]

■ It is generally inappropriate for a court of appeals to make in the first instance a determination whether documents contain producible Jencks Act statements. *See Goldberg v. United States*, 425 U.S. 94, 108, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976). "Whether notes of an interview can fairly be said to be a witness' own statement is a fact question." *United States v. Miller*, 771 F.2d 1219, 1231 (9th Cir.1985). The district court's error therefore requires us to remand this issue for a determination whether the FBI 302 reports contained substantially verbatim accounts of the interviews with the agents, and if so, whether the failure to produce them at trial resulted in harmless error. *See United States v. Wallace*, 848 F.2d 1464, 1471 (9th

**32.** This case is not controlled by *United States v. Pisello,* 877 F.2d 762 (9th Cir.1989), where the court rejected the defendant's claim that the rough interview notes taken by FBI agents were producible under the Jencks Act *simply* because the government had produced formal memoranda based on the notes.

**33.** We do not mean to imply that defense counsel generally should request that the witness review the alleged Jencks Act statement to determine whether it contains a substantially verbatim account. In *Campbell,* the Court condemned the district court's decision to permit the witness, upon the government's motion, to inspect the document. "Reliance upon the testimony of the witness based upon his inspection of the controverted document must be improper in almost any circumstances." 365 U.S. at 97, 81 S.Ct. at 427. If the government were permitted to familiarize the witness with the contents of his prior statement while he was on the stand, the statement's impeachment value would be lessened significantly. *Id.* In this case, however, defense counsel's suggestion that the wit-

ness could review the document should have prompted the district court to consider other options to discharge its affirmative obligations under the Jencks Act.

**34.** The district court's written order provides some insight into its error. The district court evidently misread *United States v. Griffin,* 659 F.2d 932 (9th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982), as creating a hard and fast rule that rough notes never can contain a substantially verbatim account of an interviewee's own words. The *Griffin* court held that the imposition of sanctions against the government is inappropriate where government agents in good faith destroyed rough interview notes with government witnesses and "those notes can be determined by secondary evidence not to be Jencks Act 'statements.'" *Id.* at 938 n. 5. The court explicitly recognized, however, that secondary evidence may indicate that rough interview notes do contain verbatim statements. *Id.* Similarly, formal 302 reports may repeat these substantially verbatim statements.

Cir.1988). The district court shall attend to this matter forthwith. We reject Rewald's request that Judge Fong be disqualified from hearing further proceedings in this case. We retain jurisdiction over any appeals on this issue. *Id.* at 1476.

## XI

■ Rewald contends that he is entitled to a new sentencing hearing as a result of the district court's alleged failure to adjudicate an alleged factual inaccuracy in his pre-sentence report. Specifically, Rewald argues that the district court failed to comply with Fed.R.Crim.P. 32(c)(3)(D), which provides in part:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, *as to each matter controverted,* make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

(emphasis added).

The alleged inaccuracy concerns an affidavit signed by actress Bo Derek. At his sentencing hearing, however, Rewald's counsel informed the court as follows: "On the Bo Derek affidavit, again, your Honor, we don't have the ability at this time to really refute the allegations made in that affidavit." Consequently, Rewald did not sufficiently controvert the Derek affidavit at his sentencing hearing under Rule 32(c)(3)(D). We therefore deny his request for resentencing.

## XII

■ Prior to oral argument, the government filed a motion to dismiss appellant's appeal, or in the alternative, to strike his briefs and exhibits. Indeed, appellant's filings with this court are most unusual. Rewald sought countless extensions of time to file his briefs, and when he finally did so, he filed hundreds of pages of exhibits without an index. He repeatedly makes reference to matters outside the record on appeal and fails to cite to the appropriate part of the record on appeal. He makes dozens of points using rhetorical questions but fails to provide legal argument. And, on occasion, he fabricates.

For its part, the government's brief also is inadequate. The government has not responded to many of Rewald's arguments. This omission has caused the court considerable hardship, as we have had to comb the trial record in search of matters with which the government is intimately familiar. The government has not responded to Rewald's claim that Peyton is a CIA attorney, although Peyton signed the government's brief. The government even failed to respond to Rewald's Jencks Act claim, which we have found to have merit.

We deny the government's motion to dismiss Rewald's appeal and to strike his briefs and exhibits. While the court either has declined to or is unable to review certain claims because of Rewald's failure to comply with appropriate procedures, the sanction sought by the government is inappropriate.

REMANDED.